IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAX ANALYSTS and ALLEN KENNEY,     )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )     No. 1:06-cv-01983-ESH
                                   )
INTERNAL REVENUE SERVICE,          )
                                   )
            Defendant.             )

**MOTION OF INTERNAL REVENUE SERVICE FOR SUMMARY JUDGMENT**

Pursuant to Fed.R.Civ.P. 56, the Internal Revenue Service moves this Court for an order granting it summary judgment and dismissing the present FOIA action.  As grounds for this motion, the IRS contends that there are no material issues of genuinely disputed facts and that it is entitled to judgment as a matter of law.  Specifically, the IRS contends that the only documents potentially responsive to plaintiffs' FOIA requests are "Monthly Performance Reviews" ("MPRs"), which are exempt from disclosure in their entirety under 5 U.S.C. § 552(b)(5) and the deliberative process privilege.

MPRs are prepared for the Commissioner of the Internal Revenue Service by his Program Advisor.  These MPRs summarize critical data and information – including analyses, conclusions, and commentary – the Program Advisor solicits from Internal Revenue Service business unit executives and project team leaders or their staffs on topics selected by the Commissioner.  The MPRs are used by the Commissioner and his senior executives to look corporately at the Service, see key trends and relationships

2285548.1

that drive the organization, and make decisions regarding the Service's ongoing

operations, including, but not limited to, allocating financial and human resources.  As

such, the MPRs are both predecisional and deliberative and protecting them from

release serves the purposes behind the deliberative process privilege.

This motion is based upon the Declaration of Mark W. Everson, attached hereto

as Exhibit 1, the Declaration of Brad Bouton, attached hereto as Exhibit 2, the

Declaration of Adrienne Mikolashek, attached hereto as Exhibit 3, the

contemporaneously filed Internal Revenue Service's Statement of Material Facts Which

Are Not in Genuine Dispute, the Memorandum of Points and Authorities in Support of

Internal Revenue Service's Motion for Summary Judgment, and the entire record of this

proceeding.

Dated:  March 9, 2007.

Respectfully submitted,


/s/ David M. Katinsky
DAVID M. KATINSKY
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6435


OF COUNSEL:

JEFFREY A. TAYLOR
United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TAX ANALYSTS and ALLEN KENNEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:06-cv-01983-ESH |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | Declaration of Mark W. Everson |
| | ) | |
| Defendant. | ) | |

I, Mark W. Everson, pursuant to the provisions of 28 U.S.C.§1746(2), declare as follows:

1.    I am the Commissioner of the Internal Revenue Service (IRS), a bureau of the Department of Treasury.  I was appointed to this position by President George W. Bush and confirmed by the United States Senate on May 1, 2003 for a five (5) year term.  Prior to accepting this appointment, I held senior executive level management positions both within the Federal government (Office of Management & Budget (OMB)) and in private industry (SC International Services Inc. and Pechiney Group).  While a deputy director at OMB, I provided government-wide leadership to executive branch agencies to strengthen management and improve program performance.  During this time, I also chaired the President's Management Council, a group composed of cabinet department and major agency chief operating officers, charged with improving overall executive branch management within the Federal government, including implementation of the President's Management Agenda.

EXHIBIT 1

2.    As the Chief Executive of the agency, I work closely with the Deputy Commissioners in making all critical decisions and formulating policy.  The Deputy Commissioner for Services and Enforcement oversees the Operating Divisions, Criminal Investigation, Office of Professional Responsibility, and the Whistleblower Office.  He is accountable for improving taxpayer services and strengthening enforcement initiatives.  The Deputy Commissioner for Operations Support integrates the support functions, facilitating economy of scale efficiencies and better business practices in the IRS.  She is accountable for our modernization efforts.

3.    I am personally familiar with the Freedom of Information Act request made by plaintiffs.  Having read plaintiffs' request letter, it is my understanding plaintiffs requested monthly performance reports issued by my office to the IRS's operating divisions from January 1, 2005 through the present.

4.    It is my understanding that plaintiffs, in an attempt to further explain the request, attached a copy of a report from Fiscal Year 2002 entitled "FY 2002 Monthly Summary of Performance through September 2002" to a recent court filing.  That report was a spreadsheet of data on the agency's performance and contained minimal commentary or narrative from the business units or project managers to explain the data.  At my direction, the office of the Chief Financial Officer stopped producing this report with the close of the 2004 fiscal year; I found it did not provide me with the information and analysis I needed to effectively manage the IRS.

EXHIBIT 1

5.    Since January 2005, Brad Bouton, a Program Analyst on my staff, at my direction, has been writing a report entitled "Monthly Performance Review." Based on my experience in private industry, I wanted a report that provides a snapshot of certain aspects of the agency's operations that can be used by the top 25 to 30 executives within the IRS to be informed about the most critical aspects of the agency's on-going projects and activities, and used by myself and my deputies to help make decisions regarding on-going operations of the IRS.

6.    The Monthly Performance Review distills the available information regarding the IRS down to a select few areas. This allows me and my deputies to focus on and make informed decisions about the most critical aspects of the agency's performance that warrant our attention. The material included in the report is highly selective and reflects our determination of those areas of the IRS that warrant our personal attention so we can understand the issues, the risks, and the potential hurdles that need to be overcome to attain a goal or see various projects and initiatives to completion. The distillation of material is important because the IRS generates voluminous data. By nature of management, not all of these data points can be monitored at each level of the organization. I consider the topics covered in the Monthly Performance Review as those that are sufficiently critical such that failures in these areas could damage overall agency operations or otherwise adversely affect tax administration. My deputies and I exercise judgment to identify these critical few items.

EXHIBIT 1

7.    On a day to day basis, I rely on the business unit executives to make decisions regarding the operations of their respective organizations. I created the Monthly Performance Review, in part, as a way for business unit executives and project team managers to elevate particular issues to my attention. Elevating these issues gives me the opportunity to consult with members of my staff and the Senior Executive Team (SET) before my deputies and I make any decisions as to the best course of action for the agency. It also allows us to make informed decisions on an agency-wide basis to enable the individual business units to attain their targeted goals or resolve problems hindering the agency's operations or performance. Because the select issues captured by the Monthly Performance Review require the personal attention of my deputies and me, these issues are subject to change as they evolve and new critical items are identified.

8.    To improve the IRS's overall performance and service to the public, I continually push the business unit executives and project team leaders to look for ways to improve the operation and performance of their respective organizations. Each year I meet with the business unit executives and project team leaders to establish internal goals for the fiscal year. These goals are intentionally set at aggressive levels and are aimed at not only meeting, but often significantly exceeding the prior year's performance figures. The Monthly Performance Review shows the internal goals targeted for each business unit or project team for a fiscal year, the current status of where each organization is in attaining the current goal, and the degree of improvement (or absence thereof) over the prior fiscal year. These items are intended to stimulate internal

4                                                        EXHIBIT 1

discussion, rather than to be rigid snapshots. We must have the flexibility to respond to shifting priorities and the changing availability of resources over the course of the fiscal year. For example, the Congress only completed action on the FY 2007 budget in February, over a third of the way through the fiscal year, requiring the adjustment of operations.

9.    I view the Monthly Performance Review as an evolving document, and with each Monthly Performance Review, I encourage the business unit executives and the project team leaders to provide commentary that will show more of the tensions that exist within the agency among the business units and project team leaders. As candor within the report increases, I believe this will foster better discussions at the highest levels to improve my decision-making and the administration of the agency.

10.    I rely on the narrative commentary in the report to provide me and my deputies with the business unit and project teams' perspectives on their respective performance, risks, and ability to attain the set goals. The Monthly Performance Review brings together the data, analysis and commentary in one complete agency-wide package, enabling me and my deputies to make decisions across the organization as to whether and how to reallocate financial and human resources among business units to keep the organizations on target to meet the aggressive internal goals set for the fiscal year.

EXHIBIT 1

11.    Based on my prior experience, I have also learned the benefits to an agency of getting the most senior business unit executives and project team leaders to look not only at their own functions, but to understand how to look at those functions as a part of the greater organization.  I have found that by distributing the Monthly Performance Review during my SET meetings, it gives the business unit executives and project team leaders a global view of the agency, in contrast to their own parochial view of their respective, limited segments, and helps them better understand how my decisions to reallocate resources, human and financial, or make policy changes, benefits the whole agency.  The Monthly Performance Review is the single means by which the SET can see the IRS's goals across the agency and how their respective organizations and goals fit into the agency as a whole.

12.    During my tenure as Commissioner of the IRS, I have endeavored to change the culture within the executive management of the agency to encourage more open discussion by and among the business units.  I continue to encourage the business units to look beyond their limited organizations and understand their organizations' role within the context of the agency as a whole.  Such an understanding fosters discussions by SET members across organizational lines and further helps them make better day-to-day decisions with respect to their own organizations.  It also allows them to develop alternative proposals for me and my deputies, with respect to their own organizations, that take into account the agency's competing interests.

EXHIBIT 1

13.    Releasing the Monthly Performance Review to the public would eliminate the candor and frank discussion I have strived to foster within the IRS.  Once released, I would anticipate the following consequences, all of which would erode my ability to manage effectively the IRS and would harm the interests of the public the IRS seeks to serve:

a.    Business unit executives and project team leaders would argue for setting their internal goals at much lower levels than they are presently, in order that they could be more readily met, preventing me from recognizing the true potential of the business unit or project and from making decisions that will benefit the organization as a whole, to the detriment of the public we serve;

b.    Business unit executives and project team leaders would feel pressure to portray their organizations as being on target to achieving their goals, thus skewing my decision-making process for maximizing the allocation of scare resources, again to the detriment of the public we serve;

c.    Managers would be far less candid in their commentary to the author of the report about the state of their operations and reluctant in general to alert IRS executives about potentially controversial situations, thereby preventing me and my deputies from getting an accurate picture of the agency's operations and performance;

d.    The public would reach premature conclusions about the IRS, its operations, and what it believes the Commissioner should and should not respond to based on incomplete information and partial data;

EXHIBIT 1

      e.     The public would second guess our decisions as to which issues are deemed significant for inclusion in the report and raise questions about why certain projects are highlighted over others;

      f.     The premature release of information about the IRS's internal debate, evaluation, and analyses related to the projects and issues discussed in the Monthly Performance Review, would mislead the public regarding the policies and priorities of the IRS, and

      g.     It would be more difficult to internally resolve critical issues and, where necessary, determine how and when to involve appropriate Treasury executives in that resolution process.

      14.     It is my firm belief that the IRS, or any government agency, must be run to encourage candor and frank discussion at all levels, and especially at the most senior levels of the organization's leadership. Without such candor and frank discussion, an agency cannot work in the best interests of the public it serves. A decrease in the internal debate, by the top leaders of the agency, as to what issues should receive my attention increases the probability that certain potentially controversial or otherwise significant issues would go unaddressed. The failure to raise such issues or masking the true facts of a problem, would prevent me from being able to address them

EXHIBIT 1

immediately and directly.  Releasing the Monthly Performance Review, in whole or in part, would reduce the candor and frank discussion, I, as an agency head, need to make timely and informed decisions on behalf of the organization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6 , 2007.

_____
Mark W. Everson
Commissioner
Internal Revenue Service
1111 Constitution Ave, NW
Washington, D.C.  20224

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAX ANALYSTS and ALLEN KENNEY,    )
    )
        Plaintiffs,    )
    )
    v.    )    No. 1:06-cv-01983-ESH
    )
INTERNAL REVENUE SERVICE,    )    Declaration of Brad Bouton
    )
        Defendant.    )

I, Brad Bouton, pursuant to the provisions of 28 U.S.C. § 1746(2), declare as follows:

1.    I am a Program Advisor on the immediate staff of the Commissioner of the Internal Revenue Service Mark Everson.  I have been in my current position since January 2005 and employed with the Internal Revenue Service (IRS or Service) for over 12 years.  My job requires me to provide analytical and data support to the Commissioner, the Deputy Commissioner for Services and Enforcement, the Deputy Commissioner for Operations Support, and Chief of Staff.  My position requires me to be familiar with the internal reports, statistics and data generated and maintained by the different business units and project managers within the Service.  Based on the data I gather from these various organizations within the Service, I provide analyses on topics as requested by the Commissioner to assist him in making decisions regarding the operations of the IRS including the allocation of resources, to assist him in preparing for executive meetings with other IRS officials or with officials from the Office of Management and Budget, and/or other executive agencies, and in preparing to testify

EXHIBIT 2

before Congress.

2.      I am personally familiar with the Freedom of Information Act (FOIA) request made by plaintiffs.  Having read plaintiffs' request letter, it is my understanding that plaintiffs requested "monthly performance reports issued by the IRS Commissioner's office to the IRS's operating divisions from January 1, 2005 through the present."  It is my understanding that plaintiffs, in an attempt to further explain what they have requested, attached a copy of a report from Fiscal Year 2002 entitled "FY 2002 Monthly Summary of Performance through September 2002" to a recent court filing.

3.      I am familiar with the report attached to plaintiffs' court filing.  That report is no longer prepared and was last issued for September 2004.  That report was a spreadsheet of statistics and data on the agency's performance and contains minimal commentary from the business units or project team leaders to explain the data.

4.      The only report that might be considered responsive to plaintiffs' request is a report entitled "Monthly Performance Review" that I have authored since January 2005, for Commissioner Everson, based on the input and information I solicit and collect from the business unit executives and project team leaders, or their staffs.  While plaintiffs' request referred to a report issued by the Commissioner, the flow of information contained in the Monthly Performance Review is actually from subordinates reporting up to the Commissioner and not from the Commissioner down to the operating units.  The report is only shared with the Commissioner and members of his Senior Executive Team (SET)[1], and select members of the Chief Financial Officer's staff who

---

[1] The following business unit executives are members of the SET:  Chief of Staff; Chief, Appeals; Chief, Communications & Liaison; Chief,  EEO & Diversity; Director, Office of Research, Analysis & Statistics; National Taxpayer Advocate; Deputy Commissioner Services & Enforcement; Chief, Criminal Investigation; Director, Office of Professional Responsibility; Commissioner, Large & Mid-Size Business;

EXHIBIT 2

work on budget and performance measures to verify the accuracy of their own statistics. I generate the Monthly Performance Review approximately 10 times each year based in part on the availability of fiscal year data and in anticipation of periodic meetings of the SET. I know of no other report that could be considered responsive to plaintiffs' request. Based on my position and duties, if there were any other such reports, I would be aware of them.

5.     The Monthly Performance Review is designed to present critical data and information in summary form regarding the IRS, as requested by the Commissioner, to allow him to look corporately at the IRS and see key trends and relationships that drive the organization.   The factual information in the Monthly Performance Review is culled from a much larger volume of raw data to enable the Commissioner to focus his attention on what he considers the most critical aspects of the agency's performance during that time frame.

6.     The Monthly Performance Review contains a summary, including data and analysis, of projects and issues the Commissioner has determined warrant his attention. For each project and issue, the report contains a summary of internal plans and goals, performance to date, projections, comparisons to the prior fiscal year, and analysis by the various business units with my input as described in paragraphs 12 through 15 below, regarding a business unit or project team's ability to meet these goals or stay on plan.

7.     Information in the Monthly Performance Review is presented both in

---

Commissioner, Small Business/Self-Employed; Commissioner, Tax Exempt & Government Entities; Commissioner, Wage & Investment; Deputy Commissioner Operations Support; Chief, Agency Wide Shared Services; Chief Financial Officer; Chief Human Capital Officer; Chief Information Officer; Chief, Mission Assurance & Security Services; and Chief Counsel.

EXHIBIT 2

graphic and in narrative form. The charts and graphs contained in the report depict the narrative by overlaying current year performance and targeted projections on top of prior year performance. Color coding is used to highlight for the Commissioner whether a project or business unit is perceived to be on target, at a particular point in time, to attain its projected goal.

8.     The Monthly Performance Review is the product of the Commissioner's desire to have a tool that provides a snapshot of critical information about the Service that is important to him and his staff based on its potential impact on the organization's tax administration operations and service to the public. With this report, the Commissioner stays informed, notices changes or trends, and makes decisions regarding policies to keep the IRS focused on its mission and the necessary resources to accomplish that mission.

9.     The Monthly Performance Review reflects the internal goals established by the Commissioner for each of the business units and project team leaders.

10.     The form and content of the report is continually evolving to meet the needs of the Commissioner. The report, as currently constituted, has been modified numerous times since the first such report was written in January 2005; changes continue to be made to its format and the information reported. Most of the changes are the result of the Commissioner and his deputies' need for additional information or input from the business units and project teams on the matters he determines are most significant to the mission of the IRS, and which he believes require his personal attention.

11.     The Commissioner and his deputies determine what sensitive projects and

EXHIBIT 2

topics are included in the Monthly Performance Review.  Periodic adjustments to the

content of the Monthly Performance Review are made at the Commissioner's direction.

Projects are removed, generally at their completion or when significant progress has

been made.  Projects are added when the Commissioner and his deputies believe they

warrant their attention and decisions.  Topics are also added to the report during the

year to reflect "hot topics" the Commissioner has identified as warranting his attention

so as to allow him and the SET to make decisions to monitor selective areas of

performance within the business units or projects.

12.     Based on the matters identified by the Commissioner and his deputies, the

report consists of information I gather from the business units and the project teams.  I

encourage my contacts in the business units and project teams to provide me with a

frank assessment of their program's performance and risk.  They pull the information

from reports generated by their respective organizations or from databases maintained

by their respective organizations.  In addition to any data I receive from the

organizations regarding their operations, they also supply narrative commentary and

analyses explaining or justifying their data, their assessments as to their ability to meet

targeted goals, and risk assessment as to hurdles they foresee in attaining those goals.

13.     Once I have collected the data and other information from the

organizations, I perform my own analysis of the data to determine whether an

organization is on track to attain its goals and where shortfalls may exist.  If my

conclusions differ from the explanation or commentary supplied by the business unit or

the project team, I contact that organization and ask further questions.  A dialogue

ensues to resolve differences and where this cannot be accomplished, the differences

EXHIBIT 2

are noted in the report.  This dialogue is also important because it allows the organizations and myself to identify and report potential problems as soon as possible to allow the Commissioner, his deputies, and the SET to make changes or adjustments to policies and operations.

14.    To provide me with a complete picture of an organization or project's performance, I receive far more information than what is actually contained in the Monthly Performance Review.  The additional data allows me to run my own analysis to determine if a business unit or project team is on target.  Based on the Monthly Performance Review topics, I select what data best reflects these topics and the format in which it is presented.  Likewise, the commentary and narrative include my own opinions and describes for the Commissioner what I think the data reveals about the respective organizations and their performance.  Where possible, I try to write the narrative in such a style that my opinion can be distinguished from factual statements and from the opinions articulated by the individual business units or project teams.

15.    Where time allows, I forward to each business unit executive or project team leader copies of the draft pages of the report attributed to their business unit or project.  These individuals generally do not edit what I write, but do note where they believe I have not made accurate factual representations.  Where their comments do show factual inaccuracies, I will make changes.

16.    Once I have compiled all the data and completed my and the business unit and project teams' commentary, the Commissioner, the Deputy Commissioners and the Chief of Staff review the report in draft form.  The Commissioner often questions portions of the report based on his independent knowledge of a particular topic or

EXHIBIT 2

issues known to him that affect the operations of the agency.  The Commissioner may also ask that I add a particular topic to the report that he thinks warrants his attention and that of his staff as well as discussion with the SET.

17.     I have designed the report to contain several flags to capture the reader's attention.  One such flag is the use of color coding (green, yellow, and red) to indicate whether a business unit or project is on target to meet its internal goals.  While this color coding is based in part on the data provided from the business units and program heads, it is subjective, based upon my judgment and analysis as well as input from the affected business unit or program head.

18.     The Commissioner has asked that I bold text to draw his attention to particular issues or items of information that I believe warrant his special attention; therefore, the bolded text exclusively reflects my determination as to the relative importance of these issues and items.

19.     The Monthly Performance Review is written approximately 10 times each year.  There is generally no report for October or November because there is insufficient data during the first two months of the fiscal year, and quite often there is no budget yet approved.

20.     The Monthly Performance Review is generally distributed to SET members the day of the meeting or, at most, the day before.  The SET meets monthly and at the end of each quarter.  The report is discussed in some degree at the quarterly meetings, but it is the primary topic of discussion at the monthly meetings and allows the Commissioner to hear directly from each of the business units in their own words where they stand in attaining their goals and what the hurdles are that need to be

EXHIBIT 2

addressed by the Commissioner.   Based upon the Monthly Performance Review and what the Commissioner hears at these meetings, he makes the decisions he deems appropriate to manage the IRS more effectively.

21.    The report is distributed to the SET, select members of the Chief Financial Officer's staff who work on budget and performance measures to verify the accuracy of their own statistics, and the Commissioner's immediate staff.   The recipients are directed not to distribute the document.   Since its inception, each Monthly Performance Report has the following statement:

> This report contains information that is pre-decisional and deliberative to assist in formulating IRS corporate performance decisions and policies.   It should not be distributed further.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on *March 5*, 2007.

Brad Bouton
Program Analyst
Office of Commissioner
Internal Revenue Service
1111 Constitution Ave, NW
Washington, D.C. 20224

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TAX ANALYSTS and ALLEN KENNEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:06-cv-01983-ESH |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | Declaration of Adrienne Mikolashek |
| | ) | |
| Defendant. | ) | |

I, Adrienne M. Mikolashek, pursuant to the provisions of 28 U.S.C. § 1746(2), declare as follows:

1.      I am an attorney in the Office of Chief Counsel, Disclosure and Privacy Law, Branch 2, Internal Revenue Service (IRS) and, since January 2007, have been assigned to the above-captioned case.  I have been employed as an attorney in Disclosure and Privacy Law since January 2006.  My duties include assisting the Department of Justice in defending the IRS in litigation under the Freedom of Information Act (FOIA).  These duties require knowledge of the types of documents created and maintained by the various divisions and functions of the IRS, and an understanding of the provisions of the FOIA, which exempt certain documents from disclosure in response to a request.

2.      I am familiar with plaintiffs' FOIA request and the report entitled the "Monthly Performance Review," which is prepared by a program analyst on the Commissioner's staff.

3.      I reviewed the 17 Monthly Performance Reviews from January 2005 through August 2006 to identify those portions of the reports that may be exempt from

EXHIBIT 3

disclosure under the FOIA, other than the deliberative process of exemption 5, which the IRS asserts applies to each report in its entirety (and discrete portions thereof).

4.      I am familiar with the segregation requirement of subsection (b) of the FOIA for any nonexempt information contained in responsive agency records. I have reviewed all documents at issue in this litigation and have attempted to identify any portion of every responsive document that would be available to the plaintiff but for the assertion of exemption 5.

5.      I personally reviewed the 17 Monthly Performance Reviews and determined that eight (8) reports each contained one page that referenced the confidential tax return information of a taxpayer.[1]  In the Monthly Performance Reviews dated January 2006, February 2006, March 2006, April 2006, and May 2006, there are discussions of a pending request by a specific taxpayer for a private letter ruling.  These discussions described the nature of the prospective transaction for which the taxpayer sought an IRS's ruling and updated the status of that ruling.  The June 2006, July 2006 and August 2006 reports discussed aspects of the prospective transaction based on the taxpayer's private letter ruling and in light of other changed circumstances.  Because the prospective transaction involved certain federal agencies, it was identified as a matter warranting the Commissioner's attention. In addition to the aforementioned details, even identifying the particular area of the report where this information is included, given the public nature of the issued ruling, may indirectly reveal the identity of the taxpayer.  In addition to the identity of this taxpayer, the names of the federal agencies having an interest in the transaction remain the taxpayer's confidential return

---

[1] January 2006, page 31; February 2006, page 33; March 2006, page 33; April 2006, page 34; May 2006, page 34; June 2006, page 34; July 2006, page 34; and August 2006, page 34.

EXHIBIT 3

information because they are part of the letter ruling that are not open to public inspection under I.R.C. § 6110.  I.R.C. § 6103(b)(2)(B).

      6.    The portions of these eight pages described above are exempt from disclosure to plaintiff under FOIA exemption (b)(3) in conjunction with I.R.C. § 6103(a), because these portions constitute "return information," as defined by I.R.C. § 6103(b), of a third-party taxpayer.  Further, release of any of these portions in light of the publicly available private letter ruling would identify other details of the transaction that were not made publicly available and would identify the taxpayer.  There is no exception in the Internal Revenue Code that would authorize the release of this information to plaintiffs.

EXHIBIT 3

7.    Plaintiffs are not entitled to any of the information in the Monthly Performance Reviews because, as the report is described in the declaration of Brad Bouton, each report contains a narrative self-assessment of the business units and project teams as to their respective organization's performance and the risks and hurdles facing their organizations.  Further, the data in the reports is selected by Brad Bouton from a wider universe of information to apprise the Commissioner and his key advisors of issues identified by them as critical to the IRS's operations.  Disclosure of either the narrative or data portions of the Monthly Performance Reviews would expose the deliberative process of IRS executives with respect to significant issues that substantially impact the agency's tax administration and overall operations.  The Monthly Performance Review is written at the direction of and for the Commissioner and his deputies, to allow them to make informed decisions regarding policy and allocation of resources, human and capital, across the IRS.  Because every portion of each Monthly Performance Review is subject to an exemption, I have determined that no portion of any of these reports can be reasonably segregated for disclosure.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __March 8__, 2007.

Adrienne M. Mikolashek
Office of Chief Counsel
(Disclosure & Privacy Law)
Internal Revenue Service
Washington, D.C. 20224

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAX ANALYSTS and ALLEN KENNEY,     )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )          No. 1:06-cv-01983-ESH
                                   )
INTERNAL REVENUE SERVICE,          )
                                   )
          Defendant.               )

**ORDER GRANTING MOTION OF
INTERNAL REVENUE SERVICE FOR SUMMARY JUDGMENT**

Having considered the Motion of Internal Revenue Service for Summary

Judgment, the Internal Revenue Service's Statement of Material Facts Which Are Not in

Genuine Dispute, the Memorandum of Points and Authorities in Support of Internal

Revenue Service's Motion for Summary Judgment, the opposition and reply to the

summary-judgment motion, and the entire record of this proceeding, it is by the Court

FOUND that there are no genuine disputes of material facts and that the Internal

Revenue Service is entitled to summary judgment as a matter of law; and it is further

ORDERED that the Motion of Internal Revenue Service for Summary Judgment

be, and is, GRANTED; and it is further

ORDERED that this case be dismissed with prejudice; and it is further

ORDERED that the Clerk distribute copies of this order to all parties.

SO ORDERED this ____ day of _____, 2007.

_____
UNITED STATES DISTRICT JUDGE

2286315.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAX ANALYSTS and ALLEN KENNEY,      )
                                    )
                Plaintiffs,         )
                                    )
        v.                          )        No. 1:06-cv-01983-ESH
                                    )
INTERNAL REVENUE SERVICE,           )
                                    )
                Defendant.          )


### INTERNAL REVENUE SERVICE'S STATEMENT OF
### MATERIAL FACTS WHICH ARE NOT IN GENUINE DISPUTE

Pursuant to L.Civ.R. 7.1(h) and 56.1, the Internal Revenue Service ("the Service")

asserts that the following facts are not in genuine dispute:

1.      In plaintiffs' complaint, they allege that they submitted to the Service two

FOIA requests for "any and all monthly performance reports issued by the office of the

Commissioner to the IRS operating divisions from January 1, 2005 to the present."

(Complaint, ¶¶ 6-7.)

2.      At the direction of the Commissioner of the Internal Revenue Service ("the

Commissioner"), the Service's Office of the Chief Financial Officer stopped producing

in September 2004 the "Monthly Summary of Performance" report an example of which

plaintiffs attached as Exhibit A to their motion for a <u>Vaughn</u> index or, in the alternative,

for *in camera* inspection.  Thus, no such report has been produced between January 1,

2005 and the present.  (Declaration of Mark W. Everson ("Everson Decl,") ¶ 4;

Declaration of Brad Bouton ("Bouton Decl."), ¶ 3.)

2267524.3

3.      With the possible exception of the Monthly Performance Reviews, discussed below, Brad Bouton, Program Advisor to the Commissioner, does not know of any report responsive to plaintiffs' requests; if there was such a report, he would be aware of it.  (Bouton Decl., ¶ 4.)

4.      Since January 2005, Bouton, at the direction of Commissioner Everson, has authored a report for the Commissioner, entitled "Monthly Performance Review" ("MPR"), based on the input and information he solicits and collects from the business unit executives and project team leaders or their staffs.  The report is only shared with the Commissioner, members of his Senior Executive Team (SET), [1] and members of the Chief Financial Officer's staff who work on budget and performance measures.  The flow of information contained in the report is from subordinates reporting up to the Commissioner, not from the Commissioner down.  (Everson Decl., ¶ 5; Bouton Decl., ¶ 4.)

5.      Bouton generates the MPR approximately 10 times each year based on the availability of fiscal year data and in anticipation of periodic meetings of the SET.  There

---

[1] The following business unit executives are members of the SET:  Chief of Staff; Chief, Appeals; Chief, Communications & Liaison; Chief, EEO & Diversity; Director, Office of Research, Analysis & Statistics; National Taxpayer Advocate; Deputy Commissioner Services & Enforcement; Chief, Criminal Investigation; Director, Office of Professional Responsibility; Commissioner, Large & Mid-Size Business; Commissioner, Small Business/Self-Employed; Commissioner, Tax Exempt & Government Entities; Commissioner, Wage & Investment; Deputy Commissioner Operations Support; Chief, Agency Wide Shared Services; Chief Financial Officer; Chief Human Capital Officer; Chief Information Officer; Chief Mission Assurance & Security Services; and Chief Counsel.

2267524.3

is generally no report for October or November because there is insufficient data during the first two months of the fiscal year, and quite often, there is no budget yet approved. (Bouton Decl., ¶¶ 4, 19.)

6.    The MPR is designed to present critical data and information regarding the Internal Revenue Service in summary form, as requested by the Commissioner, to allow him and the senior executives in the Service to look corporately at the Service, see key trends and relationships that drive the organization, and make decisions regarding the Service's ongoing operations.  Bouton culls the factual information in the MPR from a much larger volume of raw data to enable the Commissioner to focus his attention on what the Commissioner considers to be the most critical aspects of the agency's performance during that time frame.  (Everson Decl., ¶ 5; Bouton Decl., ¶ 5.)

7.    The MPR contains a summary, including data and analysis, of projects and issues the Commissioner has determined warrant his attention.  For each project and issue, the report contains a summary of internal plans and goals established by the Commissioner, performance to date, projections, comparisons to the prior fiscal year, and analysis by the various business units, with Bouton's input, regarding a business unit or project team's ability to meet these goals or stay on plan.   (Bouton Decl., ¶¶ 6, 9.)

8.    Information in the MPR is presented in both graphic and narrative form. The charts and graphs contained in the report depict the narrative by overlaying current year performance and targeted projections on top of prior year performance.  Color

2267524.3

coding is used to highlight for the Commissioner whether a project or business unit is perceived to be on target, at a particular point in time, to attain its projected goal. (Bouton Decl., ¶ 7.)

9.      The MPR has resulted from the Commissioner's desire to have a tool that provides a snapshot of critical information about the Service that is important to him and his staff based on its potential impact on the organization's tax administration operations and service to the public.  With this report, the Commissioner and his deputies stay informed, notice changes or trends, and make decisions regarding policies to keep the Service focused on its mission and the necessary resources to accomplish that mission.  (Everson Decl., ¶ 5; Bouton Decl., ¶ 8.)

10.      By distilling the voluminous available information regarding the Service down to a select few areas, the MPR allows the Commissioner and his deputies to focus on the most critical aspects of the agency's performance, identify those that warrant their further attention, and make informed decisions.  (Everson Decl., ¶ 6.)

11.      The Commissioner and his deputies determine what projects and topics are to be included in the MPR.  Their choices reflect their determination of those areas of the Internal Revenue Service that warrant their personal attention so they can understand the issues, the risks, and the potential hurdles that need to be overcome to attain a goal or see various projects and initiatives to completion.  The Commissioner considers the topics covered by the MPR as those that are sufficiently critical that

2267524.3

failures in those areas could damage agency operations or otherwise adversely affect

tax administration.  (Everson Decl., ¶ 6; Bouton Decl., ¶ 11.)

12.    On a day-to-day basis, the Commissioner relies on the business unit

executives to make decisions regarding the operations of their respective organizations.

He created the MPR as a way for business unit executives and project team managers to

elevate particular issues to his attention.  Elevating these issues gives the Commissioner

the opportunity to consult with members of his staff and the SET before making any

decisions as to the best course of action for the agency.  It also allows the Commissioner

to make informed decisions on an agency-wide basis to enable the individual business

units to attain their targeted goals or resolve problems hindering the agency's

operations or performance.  The issues captured by the MPR represent a select group of

issues the Commissioner deems critical to the agency's overall mission and worthy of

the personal attention of he and his deputies at a particular time.  (Everson Decl., ¶ 7.)

13.    Periodic adjustments to the content of the MPR are made at the

Commissioner's direction.  Generally, projects are removed at their completion or when

significant progress has been made.  Projects are added when the Commissioner

believes they warrant attention and decisions by himself and his deputies.  Topics are

also added to the report during the year to reflect "hot topics" the Commissioner has

identified as warranting his attention so as to allow him and the SET to monitor

selective areas of performance within the business units or projects.  (Bouton Decl., ¶

11.)

2267524.3

14.     Based on the matters identified by the Commissioner, the report consists of information Bouton gathers from the business units and project teams.  Each month, he requests that individuals in each business unit and project team collect information for the report.  These individuals pull the information from other reports generated by their respective organizations or from other databases maintained by those organizations.  In addition to any data Bouton receives from the organizations regarding their operations, he also receives narrative commentary and analyses from the organizations explaining or justifying their data, their assessments as to their ability to meet targeted goals, and their risk assessments as to hurdles they foresee in attaining those goals.  (Bouton Decl., ¶ 12.)

15.     Once Bouton has collected the data and other information from the organizations, he performs his own analysis of the data to determine whether an organization is on track to attain its goals and where shortfalls may exist.  If Bouton's conclusions differ from the explanation or commentary supplied by the business unit or the project team, he contacts that organization and asks further questions.  A dialogue ensues to resolve differences and where this cannot be accomplished, the differences are noted in the report.   (Bouton Decl., ¶ 13.)

16.     From the data Bouton collects, he selects what data is contained in the report and the format in which it is presented.  Bouton receives far more information than is actually contained in the MPR.  Bouton's commentary and narrative also consists primarily of his opinions and describes for the Commissioner what he thinks the data

2267524.3

reveals about the respective organizations and their performance.  Where possible, Bouton tries to write the narrative in such a style that his opinion can be distinguished from the opinions articulated by the individual business units or project teams.  (Bouton Decl., ¶ 14.)

17.     Where time allows, Bouton forwards to each business unit executive or project team leader copies of the draft pages of the report attributed to their business unit or project.  These individuals do not edit what Bouton writes, but do note where they believe he has not made accurate factual representations.  Where their comments do show factual inaccuracies, Bouton will make changes.  (Bouton Decl., ¶ 15.)

18.     Once Bouton has compiled all the data and completed his and the business units' and project teams' commentary, the Commissioner, the Deputy Commissioners and the Chief of Staff  review the report in draft form.  The Commissioner often questions portions of the report based on his independent knowledge of a particular topic or issues known to him that affect the operations of the agency.  The Commissioner may also ask Bouton to add a particular topic to the report that the Commissioner thinks warrants the attention of he and his staff, as well as discussion with the SET.  (Bouton Decl., ¶ 16.)

19.     Bouton has designed the report to contain several flags to capture the reader's attention.  One such flag is the use of color coding (green, yellow, and red) to indicate whether a business unit or project is on target to meet its internal goals.  While this color coding is based in part on the data provided from the business units and

2267524.3

program heads, it is subjective, based upon Bouton's judgment and analysis as well as input from the affected business unit or program head.  (Bouton Decl., ¶ 17.)

20.    At the Commissioner's request, Bouton also bolds text to draw the Commissioner's attention to particular issues or items of information that Bouton believes warrant his special attention.  Therefore, the bolded text exclusively reflects Bouton's determination as to the relative importance of these issues and items.  (Bouton Decl., ¶ 18.)

21.    The MPR is generally distributed to SET members the day of the meeting or, at most, the day before.  The SET meets monthly and at the end of each quarter.  The report is discussed in some detail at the quarterly meetings, but it is the primary topic of discussion at the monthly meetings and allows the Commissioner to hear directly from each of the business units in their own words where they stand in achieving their goals and what the hurdles are that need to be addressed by the Commissioner.   Based upon the MPR and what the Commissioner hears at these meetings, he makes the decisions he deems appropriate to manage the Service more effectively.  (Bouton Decl., ¶ 20.)

22.    Distribution of the report is restricted to the SET, members of the Chief Financial Officer's staff who work on budget and performance measures, and the Commissioner's immediate staff.  The recipients are directed not to distribute the document.  Since its inception, each MPR has had the following statement:

> This report contains information that is pre-decisional and deliberative to assist in formulating IRS corporate performance decisions and policies.  It should not be distributed further.

(Bouton Decl., ¶ 21.)

23.    To improve the Service's overall performance and service to the public, the Commissioner continually pushes the business unit executives and project team leaders to look for ways to improve the operation and performance of their respective organizations.  Each year the Commissioner meets with the business unit executives and project team leaders to establish internal goals for the fiscal year.  These goals are intentionally set at aggressive levels and are aimed at not only meeting, but often significantly exceeding, last year's performance figures.  The MPR shows the aggressive internal goals targeted for each business unit or project team for a fiscal year and the current status of where each organization is in attaining the current goal and the degree of improvement (or absence thereof) over the prior fiscal year.  The Commissioner believes that the ability to set aggressive internal goals reflected in the MPR is likely to be significantly stifled if those goals are subjected to public debate before or during any action taken to achieve those goals.  Moreover, he believes that, although the public may be aware of the agency's broad goals, the Service must have the flexibility to adjust the manner in which they are achieved at the detailed level depending on shifting priorities and availability of resources.  (Everson Decl., ¶ 8.)

24.    The Commissioner relies on the narrative commentary in the MPR to provide him and his deputies with the business units' and project teams' perspectives on their respective performance, risks, and ability to attain the set goals.  The MPR brings together the data, analysis and commentary in one complete agency-wide

2267524.3

package. This enables the Commissioner and his deputies to make decisions across the organization as to whether or how to reallocate financial and human resources among business units or projects to keep the organizations on target to meet the aggressive internal goals set for the fiscal year. Without this agency-wide view, the Commissioner and his deputies would be trying to make such decisions blindly by sifting through masses of statistical data without the benefit of meaningful input from his subordinate executives. (Everson Decl., ¶ 10.)

25.     Based on the Commissioner's prior experience, he has also learned the benefits to an agency of getting the most senior business unit executives and project team leaders to look not only at their own functions, but also to understand how to look at those functions as a part of the greater organization. The Commissioner finds that, by distributing the MPR during the SET meetings, it gives the business unit executives and project team leaders a broad view of the agency as a whole, in contrast to their own parochial view of their respective, limited segments, and helps them better understand how the Commissioner's decisions to reallocate resources, human and financial, or make policy changes benefits the whole agency. The MPR is the single means by which the SET can see the Service's goals across the agency and how their respective organizations and goals fit into the agency as a whole. (Everson Decl., ¶ 11.)

26.     During his tenure, the Commissioner has endeavored to change the culture within the executive management of the Service to encourage more open discussion by and among the business units. He continues to encourage the business

2267524.3

units to look beyond their limited organizations and understand each organization's role within the context of the agency as a whole.  Such an understanding fosters discussions by SET members across organizational lines and further helps them make better day-to-day decisions with respect to their own organizations.  It also permits SET members to develop alternative proposals for the Commissioner and his deputies with respect to their own organizations that take into account the agency's competing interests.  (Everson Decl., ¶ 12.)

27.    The Commissioner views the MPR as an evolving document, and the form and content of the report is continually evolving to meet the needs of the Commissioner.  The report, as currently constituted, has been modified numerous times since the first such report was written in January 2005; changes continue to be made to its format and the information reported.  Most of the changes are the result of the Commissioner's need for additional information or input from the business units and project teams on the matters he determines are most significant to the mission of the Service, and which he believes require his personal attention.  Moreover, with each MPR, the Commissioner encourages the business unit executives and the project team leaders to provide commentary that will show more of the tensions that exist within the agency among the business units and project team leaders.  The Commissioner believes that increasing candor within the report will foster better discussions at the highest levels to improve his decisionmaking and administration of the agency.  (Everson Decl., ¶ 9; Bouton Decl., ¶ 10.)

2267524.3

28.    Releasing the MPR to the public would eliminate the candor and frank discussion the Commissioner has strived to foster within the Service.  If ordered released, the Commissioner anticipates the following consequences, which would erode his ability to manage effectively the Service and would harm the interests of the public the Service seeks to serve:

a.    Business unit executives and project team leaders would argue for setting their internal goals at much lower levels than they are presently, so they could be easily met, preventing the Commissioner from recognizing the true potential of the business unit or project and from making decisions that will benefit the organization as a whole, to the detriment of the public.

b.    Business unit executives and project team leaders would feel pressure to portray their organizations as being on target to achieve their goals, thus skewing the Commissioner's decisionmaking process for maximizing the allocation of scarce resources, again to the detriment of the public.

c.    Managers would be far less candid in their commentary to the report's author about the state of their operations and reluctant, in general, to alert the Service executives to potentially controversial situations, thereby preventing the Commissioner and his deputies from getting an accurate picture of the agency's operations and performance.

2267524.3

      d.    The public would reach premature conclusions about the Service, its operations, and whether and how the Commissioner should or should not respond to the interim information in the MPR.

      e.    The public would second guess the Commissioner's decisions as to which issues are deemed significant for inclusion in the report and raise questions about why certain projects are highlighted over others.

      f.    It would mislead the public regarding the policies and priorities of the Service by prematurely releasing information about the Service's internal debate, evaluation, and analyses related to the projects and issues discussed in the MPR.

      g.    The Commissioner would lose the ability to resolve critical issues internally and, where necessary, determine how and when to involve appropriate Treasury executives in that resolution process.  (Everson Decl., ¶¶ 13-14.)

29.  The reports for January through August 2006 each contain one page that references confidential tax return information of a taxpayer, specifically a discussion about a business transaction between the Service and a taxpayer, the taxpayer's seeking of a private letter ruling, the status of the taxpayer's efforts, and the effect of the private letter ruling and other changed circumstances on the transaction.  Portions of these pages are exempt from disclosure under FOIA Exemption 3 in conjunction with 26 U.S.C. § 6103(a), because release of these portions would identify the transaction and, thus, the taxpayer.  In addition, the names of the federal agencies having an interest in the transaction are part of the private letter ruling not open to the public and are,

2267524.3

therefore, the taxpayer's confidential return information under 26 U.S.C. §§ 6110,

6103(b)(2)(B).  (Declaration of Adrienne Mikolashek, ¶¶ 5-6.)

Dated:  March 9, 2007.

<div style="margin-left: 40%;">

Respectfully submitted,


/s/ David M. Katinsky
DAVID M. KATINSKY
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6435

</div>

OF COUNSEL:

JEFFREY A. TAYLOR
United States Attorney

2267524.3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAX ANALYSTS and ALLEN KENNEY,          )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )          No. 1:06-cv-01983-ESH
                                        )
INTERNAL REVENUE SERVICE,               )
                                        )
                Defendant.              )

**CERTIFICATE OF SERVICE**

IT IS CERTIFIED that the foregoing Motion of Internal Revenue Service for

Summary Judgment, Internal Revenue Service's Statement of Material Facts Which Are

Not in Genuine Dispute, Memorandum of Points and Authorities in Support of Internal

Revenue Service's Motion for Summary Judgment, and proposed Order Granting

Motion of Internal Revenue Service for Summary Judgment were caused to be served

this 9th day of March, 2007, by depositing a true and correct copy thereof in the United

States mail, postage prepaid, addressed as follows:

2286541.1

William A. Dobrovir, Esq.
P.O. Box 198
Sperryville, VA 22740-0198

Cornish F. Hitchcock, Esq.
Suite 350
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015


/s/ David M. Katinsky
DAVID M. KATINSKY

2

2286541.1