IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TAX ANALYSTS and ALLEN KENNEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:06-cv-01983-ESH |
| | ) | |
| INTERNAL REVENUE SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
INTERNAL REVENUE SERVICE'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to L.Cv.R. 7(h) and 56.1, the Internal Revenue Service ("the Service")

submits this memorandum of points and authorities in support of its motion for

summary judgment in this Freedom of Information Act ("FOIA") case.

STATEMENT OF THE CASE

A.     Introduction

Plaintiffs filed this FOIA case on or about November 20, 2006.  In their complaint,

plaintiffs allege that they submitted to the Service two FOIA requests for "any and all

monthly performance reports issued by the office of the Commissioner to the IRS

operating divisions from January 1, 2005 to the present."  (Complaint, ¶¶ 6-7.) [1]  While

plaintiffs' complaint alleges that the Service did not respond to their FOIA request

within the time permitted by the FOIA, they nowhere allege the prerequisite for an

_____

[1] The request was not attached as an exhibit to the complaint.

action by this Court:  that the Service has improperly withheld agency records.  The

Internal Revenue Service timely filed its answer on December 26, 2006.  As its first

affirmative defense, the Service asserted that it has not improperly withheld agency

records.

Initially, it is questionable whether there are any records responsive to plaintiffs'

FOIA requests.  Plaintiffs attached as Exhibit A to their motion for a <u>Vaughn</u> index or, in

the alternative, for *in camera* inspection, a report from Fiscal Year 2002, entitled "FY 2002

Monthly Summary of Performance through September 2002," which plaintiffs asserted

to be the type of document that they are seeking in their requests and this litigation.  At

the direction of the Commissioner of the Internal Revenue Service ("the

Commissioner"), the Service's Office of the Chief Financial Officer stopped producing

these "Monthly Summary of Performance Reports" in September 2004.  Thus, no such

report has been produced between January 1, 2005 and the present, the dates covered

by the FOIA requests.   (Internal Revenue Service's Statement of Material Facts as to

Which There Is No Genuine Dispute ("Statement"), ¶ 2.)  With the possible exception of

the Monthly Performance Reviews, discussed below, Brad Bouton, Program Advisor to

the Commissioner, does not know of any report responsive to plaintiffs' requests; if

there was such a report, he would be aware of it.  (Statement, ¶ 3.)

B.    The Monthly Performance Review

Since January 2005, Bouton, at the direction of Commissioner Everson, has

authored a report for the Commissioner, entitled "Monthly Performance Review"

2260706.6

("MPR"), based on the input and information he solicits and collects from the business unit executives and project team leaders or their staffs. The report is only shared with the Commissioner, members of his Senior Executive Team (SET), [2] and members of the Chief Financial Officer's staff who work on budget and performance measures. The flow of information contained in the report is from subordinates reporting up to the Commissioner, not from the Commissioner down. (Statement, ¶ 4.)

Bouton generates the MPR approximately 10 times each year based in part on the availability of fiscal year data and in anticipation of periodic meetings of the SET. There is generally no report for October or November because there is insufficient data during the first two months of the fiscal year, and quite often there is no budget yet approved. (Statement, ¶ 5.)

The MPR is designed, at the Commissioner's direction, to present critical data and information regarding the Internal Revenue Service in summary form. In this form, the MPR allows the Commissioner and the Service's most senior executives to look at the Service on an agency-wide basis, identify key trends and relationships that drive the

---

[2] The following business unit executives are members of the SET: Chief of Staff; Chief, Appeals; Chief, Communications & Liaison; Chief, EEO & Diversity; Director, Office of Research, Analysis & Statistics; National Taxpayer Advocate; Deputy Commissioner Services & Enforcement; Chief, Criminal Investigation; Director, Office of Professional Responsibility; Commissioner, Large & Mid-Size Business; Commissioner, Small Business/Self-Employed; Commissioner, Tax Exempt & Government Entities; Commissioner, Wage & Investment; Deputy Commissioner Operations Support; Chief, Agency Wide Shared Services; Chief Financial Officer; Chief Human Capital Officer; Chief Information Officer; Chief Mission Assurance & Security Services; and Chief Counsel.

2260706.6

organization, and deliberate about the Service's ongoing operations.  The MPR is the
basis for many of the Commissioner's and the SET's decisions regarding the Service's
ongoing operations.  Bouton culls the factual information in the MPR from a much
larger volume of raw data to enable the Commissioner to focus his attention on what
the Commissioner considers to be the most critical aspects of the agency's performance
during that time frame.  (Statement, ¶ 6.)

The MPR contains a summary, including data and analysis, of projects and issues
the Commissioner has determined warrant his attention.  For each project and issue, the
report contains a summary of internal plans and goals established by the
Commissioner, performance to date, projections, comparisons to the prior fiscal year,
and analysis by the various business units, with Bouton's input, regarding a business
unit or project team's ability to meet these goals or stay on plan.  (Statement,
¶ 7.)  Information in the MPR is presented in both graphic and narrative form.  The
charts and graphs contained in the report depict the narrative by overlaying current
year performance and targeted projections on top of prior year performance. [3]  Color

---

[3] As shown below, the undisputed facts establish that the MPRs, including any
arguably factual portions, are deliberative and properly withheld in their entirety under
Exemption 5 and the deliberative process privilege.  Assuming *arguendo* that the Court
does not find that the MPRs should be withheld in their entirety, the overlaying of
current performance, prior performance, and targeted projections is just one example of
how much of the factual material is also inextricably intertwined with deliberative
material and should be withheld on that ground.  See Paisley v. CIA, 712 F.2d 686, 699
(D.C. Cir. 1984), vacated in part, 724 F.2d 201 (D.C. Cir. 1984); Brinton v. Department of
State, 636 F.2d 600, 606 (D.C. Cir. 1980); Suzhou Yuanda Enter. Co. v. U.S. Customs &
Border Protection, 404 F.Supp.2d 9, 13-14 (D.D.C. 2005).  If and only if the Court
(continued...)

2260706.6

coding is used to highlight for the Commissioner whether a project or business unit is

perceived to be on target, at a particular point in time, to attain its projected goal.

(Statement, ¶ 8.)

      The MPR has resulted from the Commissioner's desire to have a tool that

provides a snapshot of critical information about the Service that is important to him

and his staff based on its potential impact on the organization's tax administration

operations and service to the public.  With this report, the Commissioner and his

deputies stay informed, notice changes or trends, and make decisions regarding policies

to keep the Service focused on its mission and the necessary resources to accomplish

that mission.  (Statement, ¶ 9.)

      By distilling the voluminous available information regarding the Service down to

a select few areas, the MPR allows the Commissioner and his deputies to focus on the

most critical aspects of the agency's performance, identify those that warrant their

further attention, and make informed decisions.  (Statement, ¶ 10.)  The Commissioner

and his deputies determine which projects and topics are to be included in the MPR.

Their choices reflect their determination of those areas of the Internal Revenue Service

that warrant their personal attention so they can understand the issues, the risks, and

the potential hurdles that need to be overcome to attain a goal or see various projects

---

     [3](...continued)
determines that the factual record is such that it cannot find the MPRs deliberative in
their entirety, the Court should then revisit plaintiffs' motion for a <u>Vaughn</u> index or, in
the alternative, for *in camera* inspection.

2260706.6

and initiatives to completion.  The Commissioner considers the topics covered by the MPR as those that are sufficiently critical that failures in those areas could damage agency operations or otherwise adversely affect tax administration.  (Statement, ¶ 11.)

On a day-to-day basis, the Commissioner relies on the business unit executives to make decisions regarding the respective organizations' operations.  He created the MPR as a way for business unit executives and project team managers to elevate particular issues to his attention.  Elevating these issues gives the Commissioner the opportunity to consult with members of his staff and the SET before making any decisions as to the best course of action for the agency.  Elevating these issues in the MPR also allows the Commissioner to:  (1) make informed decisions on an agency-wide basis to enable the individual business units to attain their targeted goals; and (2) otherwise resolve problems hindering the agency's operations or performance.  The issues captured by the MPR represent a select group of issues the Commissioner deems critical to the agency's overall mission and worthy of the personal attention of he and his deputies at a particular time.  (Statement, ¶ 12.)

The MPR's content is periodically changed at the Commissioner's direction. Generally, projects are removed at their completion or when significant progress has been made.  Projects are added when the Commissioner believes they warrant attention and decisions by himself and his deputies.  Topics are also added to the report during the year to reflect "hot topics" the Commissioner has identified as warranting his

attention so as to allow him and the SET to monitor selective areas of performance within the business units or projects.  (Statement, ¶ 13.)

      C.     <u>The MPR Process</u>

Based on the matters identified by the Commissioner, the MPR consists of information Bouton gathers from the business units and project teams.  Each month, Bouton requests that individuals in each business unit and project team collect information for the report.  These individuals pull the information from other reports generated by their respective organizations or from other databases maintained by those organizations.  In addition to any data Bouton receives from the organizations regarding their operations, he also receives narrative commentary and analyses from the organizations explaining or justifying their data, their assessments as to their ability to meet targeted goals, and their risk assessments as to hurdles they foresee in attaining those goals.  (Statement, ¶ 14.)

Once Bouton has collected the data and other information from the organizations, he performs his own analysis of the data to determine whether an organization is on track to attain its goals and where shortfalls may exist.  If Bouton's conclusions differ from the explanation or commentary supplied by the business unit or the project team, he contacts that organization and asks further questions.  A dialogue ensues to resolve differences and where this cannot be accomplished, the differences are noted in the report.   (Statement, ¶ 15.)

2260706.6

From the data Bouton collects, he selects what data is contained in the report and the format in which it is presented.  Bouton receives far more information than is actually contained in the MPR.  Bouton's commentary and narrative also consists primarily of his opinions and describes for the Commissioner what he thinks the data reveals about the respective organizations and their performance.  Where possible, Bouton tries to write the narrative in such a style that his opinion can be distinguished from the opinions articulated by the individual business units or project teams. (Statement, ¶ 16.)  Where time allows, Bouton forwards to each business unit executive or project team leader copies of the draft pages of the report attributed to their business unit or project.  These individuals do not edit what Bouton writes, but do note where they believe he has not made accurate factual representations.  Where their comments do show factual inaccuracies, Bouton will make changes.  (Statement, ¶ 17.)

Once Bouton has compiled all the data and completed his and the business units' and project teams' commentary, the Commissioner, the Deputy Commissioners and the Chief of Staff  review the report in draft form.  The Commissioner often questions portions of the report based on his independent knowledge of a particular topic or issues known to him that affect the agency's operations.  The Commissioner may also ask Bouton to add a particular topic to the report that the Commissioner thinks warrants the attention of he and his staff, as well as discussion with the SET. (Statement, ¶ 18.)

Bouton has designed the report to contain several flags to capture the reader's attention. One such flag is the use of color coding (green, yellow, and red) to indicate whether a business unit or project is on target to meet its internal goals. While this color coding is based in part on the data provided from the business units and program heads, it is subjective, based upon Bouton's judgment and analysis as well as input from the affected business unit or program head. (Statement, ¶ 19.) At the Commissioner's request, Bouton also draws the Commissioner's attention to particular issues or items of information that Bouton believes warrant his special attention by flagging them with bold text. Therefore, the bolded text exclusively reflects Bouton's determination as to the relative importance of these issues and items. (Statement, ¶ 20.)

The MPR is generally distributed to SET members the day of the meeting or, at most, the day before. The SET meets monthly and at the end of each quarter. The report is discussed in some detail at the quarterly meetings, but it is the primary topic of discussion at the monthly meetings and allows the Commissioner to hear directly from each of the business units in their own words where they stand in attaining their goals and what the hurdles are that need to be addressed by the Commissioner. Based upon the MPR and what the Commissioner hears at these meetings, he makes the decisions he deems appropriate to manage the Service more effectively. (Statement, ¶ 21.)

The report is distributed only to the SET, members of the Chief Financial Officer's staff who work on budgeted performance measures, and the Commissioner's

immediate staff.  The recipients are directed not to distribute the document.  Since its

inception, each MPR has had the following statement:

> This report contains information that is pre-decisional and deliberative to
> assist in formulating IRS corporate performance decisions and policies.  It
> should not be distributed further.

(Statement, ¶ 22.)

       D.     <u>Commissioner's Use of the MPR</u>

To improve the Service's overall performance and service to the public, the

Commissioner continually pushes the business unit executives and project team leaders

to look for ways to improve the operation and performance of their respective

organizations.  Each year the Commissioner meets with the business unit executives

and project team leaders to establish internal goals for the fiscal year.  These goals are

intentionally set at aggressive levels and are aimed at not only meeting, but often

significantly exceeding, last year's performance figures.  The MPR shows the aggressive

internal goals targeted for each business unit or project team for a fiscal year and the

current status of where each organization is in attaining the current goal and the degree

of improvement (or absence thereof) over the prior fiscal year.  The Commissioner

believes that the ability to set aggressive internal goals reflected in the MPR is likely to

be significantly stifled if those goals are subjected to public debate before or during any

action taken to achieve those goals.  Moreover, he believes that, although the public

may be aware of the agency's broad goals, the Service must have the flexibility to adjust

the manner in which they are achieved at the detailed level depending on shifting

priorities and availability of resources.  (Statement, ¶ 23.)

  The Commissioner relies on the narrative commentary in the MPR to provide

him and his deputies with the business units' and project teams' perspectives on their

respective performance, risks, and ability to attain the set goals.  The MPR brings

together the data, analysis and commentary in one complete agency-wide package.

This enables the Commissioner and his deputies to make decisions across the

organization as to whether or how to reallocate financial and human resources among

business units or projects to keep the organizations on target to meet the aggressive

internal goals set for the fiscal year.  Without this agency-wide view, the Commissioner

and his deputies would be trying to make such decisions blindly by sifting through

masses of statistical data without the benefit of meaningful input from his subordinate

executives.  (Statement, ¶ 24.)

  Based on the Commissioner's prior experience, he has also learned the benefits to

an agency of getting the most senior business unit executives and project team leaders

to look not only at their own functions, but also to understand how to look at those

functions as a part of the greater organization.  The Commissioner finds that, by

distributing the MPR during the SET meetings, it gives the business unit executives and

project team leaders a view of the agency as a whole, in contrast to their own parochial

view of their respective, limited segments, and helps them better understand how the

Commissioner's decisions to reallocate resources, human and financial, or make policy

changes benefits the whole agency. The MPR is the single means by which the SET can see the Service's goals across the agency and how their respective organizations and goals fit into the agency as a whole. (Statement, ¶ 25.)

During his tenure, the Commissioner has endeavored to change the culture within the executive management of the Service to encourage more open discussion by and among the business units. He continues to encourage the business units to look beyond their limited organizations and understand each organization's role within the context of the agency as a whole. Such an understanding fosters discussions by SET members across organizational lines and further helps them make better day-to-day decisions with respect to their own organizations. It also permits SET members to develop alternative proposals for the Commissioner and his deputies with respect to their organizations that take into account the agency's competing interests. (Statement, ¶ 26.)

The Commissioner views the MPR as an evolving document, and the form and content of the report is continually evolving to meet the needs of the Commissioner. The report, as currently constituted, has been modified numerous times since the first such report was written in January 2005; changes continue to be made to its format and the information reported. Most of the changes are the result of the Commissioner's need for additional information or input from the business units and project teams on the matters he determines are most significant to the mission of the Service, and which he believes require his personal attention. Moreover, with each MPR, the

Commissioner encourages the business unit executives and the project team leaders to provide commentary that will show more of the tensions that exist within the agency among the business units and project team leaders. The Commissioner believes that increasing candor within the report will foster better discussions at the highest levels to improve his decisionmaking and administration of the agency. (Statement, ¶ 27.)

Releasing the MPR to the public would eliminate the candor and frank discussion the Commissioner has strived to foster within the Service. If ordered released, the Commissioner anticipates the following consequences, which would erode his ability to manage effectively the Service and would harm the interests of the public the Service seeks to serve:

a.      Business unit executives and project team leaders would argue for setting their internal goals at much lower levels than they are presently, so they could be easily met, preventing the Commissioner from recognizing the true potential of the business unit or project and from making decisions that will benefit the organization as a whole, to the detriment of the public.

b.      Business unit executives and project team leaders would feel pressure to portray their organizations as being on target to achieve their goals, thus skewing the Commissioner's decisionmaking process for maximizing the allocation of scarce resources, again to the detriment of the public.

c.      Managers would be far less candid in their commentary to the report's author about the state of their operations and reluctant, in general, to alert

2260706.6

Service executives to potentially controversial situations, thereby preventing the Commissioner and his deputies from getting an accurate picture of the agency's operations and performance.

    d. The public would reach premature conclusions about the Service, its operations, and whether and how the Commissioner should or should not respond to the interim information in the MPR.

    e. The public would second guess the Commissioner's decisions as to which issues are deemed significant for inclusion in the report and raise questions about why certain projects are highlighted over others.

    f. It would mislead the public regarding the policies and priorities of the Service by prematurely releasing information about the Service's internal debate, evaluation, and analyses related to the projects and issues discussed in the MPR.

    g. The Commissioner would lose the ability to resolve critical issues internally and, where necessary, determine how and when to involve appropriate Treasury executives in that resolution process.  (Statement, ¶ 28.)

SUMMARY OF ARGUMENT

   The MPRs, the only documents even potentially responsive to the plaintiffs' FOIA requests, should be withheld in their entirety under FOIA Exemption 5 and the governmental deliberative process privilege.  The MPRs satisfy both the technical requirements of, and the purposes behind, the deliberative process privilege.

14

Technically, the MPRs meet the definitional requirements of the privilege: they are both predecisional and deliberative. They are predecisional in that they are generated in anticipation of affecting agency policy: calling the Commissioner's attention to particular problems in vital areas for the purpose of resolving those issues, whether by reallocating financial or human resources or otherwise. Consistent with this purpose, the flow of information is from the subordinate level up to the Commissioner, not, as plaintiffs' requests seek, from the Commissioner down.

The MPRs are also deliberative in nature both in their totality and in their individual parts. No less an authority than the Commissioner has explained exactly how these reports fit into – indeed, are vital to – his decisionmaking process and how disclosing the reports would discourage frank and candid discussion. Similarly, the individual portions of the MPRs – the internal goals, the projections, and even the reports on performance to date or in the prior fiscal year – reflect the reports' deliberative nature. Setting ambitious internal goals is a vital part of the agency's deliberative process, one that would be discouraged by disclosing the MPRs. The same is true of the need for candid analyses, conclusions, and commentary. And even the more factual portions – those that report the performance of a project or business unit for a prior year or the year-to-date – represent both the Commissioner's deliberative process in determining what projects and business units require his focus and Bouton's deliberative process concerning what facts will be of the greatest use to the

Commissioner in making his decisions.  Thus, the MPRs are both predecisional and deliberative.

The Commissioner has also explained at length how disclosing the MPRs would impinge upon the concerns traditionally at the heart of the deliberative process privilege.  First, disclosure would discourage candid discussion – the primary goal of the deliberative process privilege – in three ways:

- It would discourage business unit executives and project leaders from setting ambitious goals, preventing the Commissioner from appreciating the full potential of the business unit or project;

- It would encourage those same executives and leaders to portray their organizations as being on target to meet their internal goals, skewing the decisionmaking process for allocating resources; and

- It would cause those executives and leaders to be less candid in their commentary and reluctant to alert their superiors to potentially controversial situations, exactly the type of things the Commissioner should be alerted to as part of his decisionmaking process.

Disclosure of the MPRs also engenders the other concerns behind the deliberative process privilege.  It is highly likely to lead to public confusion, since it would give to the public only a partial, incomplete picture of a business unit's or project's performance and of what may or may not result in actions by the Commissioner.  The Commissioner also believes that disclosure would be harmful to the integrity of his

16

deliberative process. It would subject him to second-guessing about his choice of topics for the report, generate pressure concerning how he should respond to interim information, and restrict his discretion concerning what to resolve internally and what to bring to the attention of Treasury executives. The Commissioner's reasoned concerns warrant deference from this Court. Accordingly, this Court should permit the Internal Revenue Service to withhold the MPRs in their entirety under FOIA Exemption 5 and the deliberative process privilege.

ARGUMENT

I.     The MPRs Are Exempt in Their Entirety From Disclosure Under FOIA
       Exemption 5 Because the MPRs Are Subject to the Deliberative Process
       Privilege.

       The only documents that are potentially responsive to plaintiffs' FOIA requests are the MPRs. [4] Assuming *arguendo* that the MPRs are responsive to plaintiffs' FOIA requests, they are exempt in their entirety from disclosure under FOIA Exemption 5 and the deliberative process privilege.

---

[4] Technically, neither the MPRs nor any other document are responsive to plaintiffs' FOIA requests. The MPRs are not responsive because they are not issued by the Office of the Commissioner to the operating divisions; rather, the MPR information flows in the other direction: from the operating divisions up to the Commissioner. (Bouton Decl., ¶¶ 4, 12-14, 16, 20-21.) The "Monthly Summary of Performance" reports, which plaintiffs pointed to in their motion for a <u>Vaughn</u> index or, in the alternative, for *in camera* inspection as the type of document they sought with their requests, were discontinued in September 2004. Bouton, who, because of his position, would know of any documents issued by the Office of the Commissioner to the operating divisions, knows of no other potentially responsive document.

2260706.6

5 U.S.C. § 552(b)(5) protects from disclosure under the FOIA "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  As the language suggests, Exemption 5 incorporates those privileges which the government enjoys in pretrial discovery under relevant statutes and case law.  See United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984); see also, NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 148 (1975) ("Exemption 5 withholds from a member of the public documents which a private party could not discover in litigation with the agency.").  Nor are the needs of a particular FOIA plaintiff relevant to whether Exemption 5 applies; only documents "normally" or "routinely" disclosable in civil discovery are outside Exemption 5. Martin v. Office of Special Counsel, Merit Systems Protection Bd., 819 F.2d 1181, 1184 (D.C. Cir. 1987) (citing Sears, Roebuck & Co., 421 U.S. at 149); see also, Weber Aircraft Corp., 465 U.S. at 799 (test is whether documents "routinely" or "normally" disclosed upon a showing of relevance).  Exemption 5 indisputably includes within its ambit documents falling under the governmental deliberative process privilege.  Sears, Roebuck & Co., 421 U.S. at 150; EPA v. Mink, 410 U.S. 73, 87 (1973).

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" Sears, Roebuck & Co., 421 U.S. at 150 (quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeisee, Jena, 40 F.R.D. 318, 324 (D.D.C. 1966)).  Disclosure of such documents could inhibit "'frank discussion of legal or policy

matters'" leading to weaker decisions and policies.  Sears, Roebuck & Co., 421 U.S. at

150 (quoting S. Rep. No. 89-813, at 9 (1965)); see also, Judicial Watch, Inc. v. Department

of Energy, 412 F.3d 125, 129 (D.C. Cir. 2005) (legislative judgment that quality of

decisionmaking would be harmed if agencies were forced to "'operate in a fishbowl'")

(quoting Tax Analysts v. IRS, 117 F.3d 607, 617 (D.C. Cir. 1997)); Wolfe v. Department of

Health and Human Services, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc) (same).  For the

governmental deliberative process privilege to protect a particular document, that

document must be both predecisional and deliberative in nature.  Judicial Watch, Inc. v.

FDA, 449 F.3d 141, 151 (D.C. Cir. 2006); see also, Judicial Watch , Inc. v. Department of

Energy, 412 F.3d at 129; Mapother v. Department of Justice, 3 F.3d 1533, 1537 (D.C. Cir.

1993).  In practice, these two requirements "tend to merge;" the privilege protects

documents "that contribute to an ongoing deliberative *process* within an agency."

Access Reports v. Department of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (emphasis

supplied in original).

        The MPRs contribute to an ongoing deliberative process within the Internal

Revenue Service; as such, they are both predecisional and deliberative.  Thus, even if

responsive to plaintiffs' FOIA requests, they are protected from disclosure under

Exemption 5 and the deliberative process privilege.

        A.    The Information Contained in the MPRs Is Predecisional.

        All of the information contained in the MPRs is predecisional.  Each MPR is

generated before – and, indeed, for the very purpose of affecting – agency policy.  It also

2260706.6

reflects a flow of information from subordinate employee to supervisory employee that the Courts often use as a telltale sign that a document is predecisional.  Finally, even the MPRs' summary and analysis of the business unit and project performance to date is predecisional in that it is a necessary prerequisite to the Commissioner's adoption of agency policy.

A document is predecisional if it is "'generated before the adoption of an agency policy.'"  Judicial Watch, Inc. v. FDA, 449 F.3d at 151 (quoting Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)); see also, Jordan v. United States Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc).  Notably, the emphasis is on protecting ongoing agency examinations of its **policies**, not on pointing to specific decisions:  "Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process."  Sears, Roebuck & Co., 421 U.S. at 151 n.18; see also, Access Reports, 926 F.2d at 1194, 1196 (Sears stands for protecting the agency **process**, not for courts concerning themselves whether there is a specific final decision); Hunt v. U.S. Marine Corps, 935 F. Supp. 46, 51 (D.D.C. 1996).  Indeed, requiring the agency to point to a specific decision **after** the document is written would defeat the main purpose of Exemption 5 – encouraging full and frank discussion.  An author would be unaware, when giving his deliberative judgment, if there would be a later clear decision either rejecting his analysis – thereby protecting it from disclosure –

20

or adopting his analysis – thereby vindicating him. The inevitable result would be that any analysis would be overly cautious. See Access Reports, 926 F.2d at 1196. Thus, the issue here is whether the MPRs are part of, and utilized in, the ongoing examination of Internal Revenue Service policies.

The answer is emphatically yes. Authoring the MPR is Brad Bouton, whose job is to gather data from organizations within the Service and provide analyses on topics requested by the Commissioner to assist him in making decisions regarding the operations of the Service, including the proper allocation of resources. The MPR's purpose, in particular, is to provide critical data and information in summary form on topics chosen by the Commissioner, drawing the attention of the Commissioner and his deputies to matters requiring their attention. The Commissioner then utilizes the MPR to consult with members of his staff and the Senior Executive Team and to make informed decisions on an agency-wide basis to enable the Service's individual business units to attain their targeted goals or resolve problems hindering the agency's operations or performance. By seeing in one combined agency-wide package, the data, analysis, and commentary, the Commissioner and his deputies can make educated, agency-wide decisions, including allocating financial and human resources across the various business units and projects of the agency. Clearly, the MPR is integral to the Commissioner's decisionmaking process and his continual reexamination of agency policies and, thus, is predecisional.

The flow of information contained in the MPR confirms this.  A key factor that courts look to as a sign that a document is predecisional, as well as deliberative, is if the document flows upward from subordinate to superior official.  A document flowing from junior to senior official is more likely to reflect the junior official's own subjective opinions than one flowing in the opposite direction, which is more likely to reflect a decision already made.  See Access Reports, 926 F.2d at 1195; Schlefer v. United States, 702 F.2d 233, 238 (D.C. Cir. 1983); Coastal States Gas Corp., 617 F.2d at 868.  The flow of information in the MPR is from subordinates up to the Commissioner.  Based on the matters the Commissioner identifies, Bouton collects the necessary information – data as well as narrative commentary and analyses – from the business units and project teams.  Bouton then adds his own analysis and commentary concerning whether an organization is on track to attain its goals and where shortfalls may exist.  The MPR is then shared only with the Commissioner and his deputies, and, no more than one day before its monthly meeting, the SET. [5]  From collecting information forward, the report flows from subordinates to the highest levels of executives in the Internal Revenue Service.  Once again, this is emblematic of a predecisional document.

Finally, the MPR's summary of the performance of the various business units and programs, comparison to their internal goals, and analysis of both is typical of predecisional – as well as deliberative – documents.  An agency's self-evaluation is

---

[5] The Chief Financial Officer's staff also can access the MPRs in preparing budget and performance measures, part of the agency decisionmaking process.

2260706.6

essential to its deliberative reexamination of its policies.  <u>Ashley v. United States Dep't of Labor</u>, 589 F. Supp. 901, 909 (D.D.C. 1983).  In <u>Ashley</u>, this Court held that documents generated by Mine Safety and Health Administration personnel as part of an in-house self-evaluation and improvement program concerning safety investigations in multiple fatality mining disasters were protected by the deliberative process privilege.  <u>Id.</u> at 908-09.  The Court rejected arguments that documents cannot be predecisional if they evaluate past agency action; on the contrary, the Court held that the authors evaluating and criticizing past agency actions to their superiors contributed to the process of changing agency procedures.  <u>Ibid.</u>  This Court held similarly in <u>Hamilton Securities Group, Inc. v. Department of Housing and Urban Dev.</u>, 106 F.Supp.2d 23 (D.D.C. 2000), <u>aff'd</u>, 2001 WL 238162 (D.C. Cir. Feb. 23, 2001), where a FOIA requester sought a draft audit report of the Federal Housing Administration's loan sales program.  The Court held that the draft audit report was both predecisional and deliberative.  It again rejected the argument that a review and evaluation was backward-looking, holding that the report's purpose was to evaluate the program so that the Office of Inspector General would recommend ways to improve the program.  <u>Id.</u> at 32.

Here too, the MPR evaluations are part of a predecisional process.  The evaluations by both the business unit and Bouton concerning the business unit's performance vis-a-vis its internal goals contained in the MPR are instrumental to the Commissioner's decisions concerning how to allocate resources and address specific problems.  Enhancing the predecisional nature of these evaluations is the fact that the

Commissioner determines what topics are to be addressed in these evaluations and continually changes either the format of the report or the particular topics added to or deleted from the report.  Where, as here, an agency makes evaluations based upon guidelines set by a high Executive Branch decisionmaker, the evaluations are intrinsically predecisional and part of the deliberative process:  "Agency reports prepared in response to specific guidelines from an executive officer, in preparation for discharge of the officer's decision-making function are considered to be a 'pre-decisional' part of the deliberative process, eligible for protection under Exemption 5."  The Washington Post Co. v. Department of Defense, 1987 U.S. Dist. LEXIS 16108, *29 (D.D.C. Feb. 25, 1987) (holding to be both predecisional and deliberative report on El Salvador's military needs prepared by military team at the direction of the Joint Chiefs of Staff to help the Defense Department determine how best to aid El Salvador).  Bouton and the business units have engaged in an evaluation of topics chosen by the Commissioner to assist his decisionmaking process.  These evaluations are predecisional, as well as deliberative, and are therefore protected from disclosure by the deliberative process privilege.

Therefore, the MPRs in their entirety are predecisional.

B.    The Information in the MPRs Is Deliberative.

The MPRs are also deliberative in nature.   A document is "deliberative" if it "'reflects the give-and-take of the consultative process.'"  Judicial Watch, Inc. v. FDA, 449 F.3d at 151 (quoting Coastal States Gas Corp., 617 F.2d at 866); see also, Judicial

24

Watch of Florida, Inc. v. United States Dep't of Justice, 102 F.Supp.2d 6, 14 (D.D.C. 2000)

(deliberative if "actually related to the process by which policies are formulated and

decisions are made"). The dispositive question in deciding whether a document is

"deliberative" is whether disclosure would "'discourage candid discussion within the

agency.'" Access Reports, 926 F.2d at 1195 (quoting Dudman Comm. Corp. v.

Department of the Air Force, 815 F.2d 1565, 1567-68 (D.C. Cir. 1987)). In answering this

vital question, this Court should defer to the agency's concerns. See Quarles v.

Department of the Navy, 893 F.2d 390, 393 (D.C. Cir. 1990) (crediting agency

representation that disclosing cost estimates would make future researchers unlikely to

give candid opinions); Chemical Mfrs. Ass'n v. CPSC, 600 F. Supp. 114, 118 (D.D.C.

1984) (holding that there should be "considerable deference" to CPSC's judgment as to

what constitutes part of the agency's "give-and-take" and what is needed to protect the

decisionmaking process); see also, Hamilton Securities Group, Inc., 106 F.Supp.2d at 30

("Courts are reluctant to force agencies to expose their decisionmaking process.").

      Here, the Commissioner, the highest-ranking official in the Internal Revenue

Service, has made clear that the MPRs are part of the agency's deliberative,

decisionmaking process and that releasing this report would discourage frank and

candid discussion. The Commissioner chooses the topics of the report so that he and

his deputies can focus on the most critical aspects of the agency, those that warrant their

attention and require decisions on their part. The MPRs track the performance of

business units and projects against ambitious goals set for the fiscal year and provide

2260706.6

analysis and commentary concerning present and future performance. This information permits the Commissioner and his deputies to make agency-wide decisions, including whether and how to reallocate financial and human resources, to keep business units or projects on target or to meet their goals. The Commissioner believes that the candor of business unit executives and project team leaders is vital to the MPR's success and the agency's mission. Moreover, he fervently – and logically – believes that releasing the MPRs – with the concomitant publicity of what is in the reports – would eliminate candor and frank discussion in the reports in the following ways: (1) the business unit executives and project team leaders would argue for lower than ideal internal goals; (2) they would portray their organizations as being on target even if they were not; and (3) they would be less candid reporting on the state of their operations and potentially controversial situations. This Court should defer to the Commissioner's reasoned conclusion of severe harm to the agency's consultative process from release of the MPRs.

Moreover, the Commissioner's conclusion concerning harm applies to the MPRs as a whole, and not just selected portions: "[T]he exemption [for the deliberative process privilege] protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." Russell v. Department of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982). As mentioned above, the MPRs contain the goals set for the fiscal year for selected business units or projects, selected performance information, the

status of the business unit or project vis-a-vis its goal or the prior year, and analyses and conclusions regarding whether the business unit or project is likely to meet its target or of any obstacles in its path.  Each of these is part of the deliberative process of the agency by which the Commissioner determines how best to allocate the resources of the agency and to otherwise help the business units or projects meet their goals.

Even if the parts of the MPR are looked at individually, they are all part of the deliberative process.  The internal goals of the various business units and projects are clearly deliberative.  Indeed, the Commissioner has stated that it is essential to the Service's mission that business unit executives and project leaders be ambitious in setting these goals, aggressiveness that will transform into caution if those executives believe their internal goals will be subject to disclosure.  The case is akin to Quarles, supra, where the FOIA requester sought material relating to the search process for a home port for a battleship group, including analyses, conclusions, and cost estimates of sites prepared by a special study team which the Navy withheld under the deliberative process privilege.  The D.C. Circuit held that the cost estimates incorporated complex judgments, including projecting needs, studying prior endeavors, and assessing possible suppliers, thus rendering them the equivalent of protected opinions.  Quarles, 893 F.2d at 392-93.  The same is true here.  The internal goals reflect similar complex judgments, based upon history and the challenges ahead, as to what the individual business units or projects can accomplish and are part of the deliberative process of the agency.

Likewise, the analyses, conclusions, and commentary by Bouton and the business unit executives and project team leaders about whether and how the individual units or projects can meet their goals are also part of the deliberative process. Indeed, they are crucial to the Commissioner's ability to make agency-wide decisions concerning the allocation of human and financial resources. Moreover, the MPRs would prematurely divulge the internal thought processes of the Commissioner – i.e., what matters are attracting his focus. Recently, this Court held in Edmonds Inst. v. United States Dep't of Interior, 460 F.Supp.2d 63, 72 (D.D.C. 2006), that such information, relating to the mechanics of the deliberative process – including a report of a team's progress in developing a section of an environmental impact statement and emails concerning the next task in the process of drafting the statement – were exempt from disclosure under Exemption 5 and the deliberative process privilege. The Court reasoned that these "would reveal DOI decisions concerning the amount of time and resources allotted to the development of particular sections of the EIS." Ibid. The same is undoubtedly true here as well. Analysis of the unit's or project's performance to date and likely future performance would reveal the areas on which the Service is focusing as well as those which may require additional resources.

Indeed, even the more factually-oriented parts of the MPRs – those relaying the performance of a business unit or project in the prior fiscal year or in the year to date – also would disclose prematurely the Commissioner's deliberative process. The D.C. Circuit has long ceased to focus on whether material can be characterized as "factual"

28

or "deliberative;" instead, it asks whether disclosure would discourage candid discussion within the agency and thereby undermine the decisionmaking process. Dudman, 815 F.2d at 1568.  As the Dudman court recognized, "Congress enacted [FOIA] Exemption 5 to protect the executive's deliberative processes – not to protect specific materials."  Ibid.; see also, Mead Data Central, Inc. v. United States Dep't of Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977).  Accordingly, even purely factual material is exempt from disclosure if it would disclose the agency's decisionmaking process. Russell, 682 F.2d at 1048; see also, Wolfe, 839 F.2d at 774; Edmonds Inst., 460 F.Supp.2d at 70.

Culling relevant from irrelevant facts is part of the process protected by the deliberative process privilege.  Mapother, 3 F.3d at 1539.  This selection process involves "'the formulation or exercise of ... policy-oriented *judgment*' or 'the process by which *policy* is formulated.'"  Ibid.  (quoting Petroleum Info. Corp. v. United States Dep't of the Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis supplied in original)); see also, Montrose Chem. Corp. of Cal. v. Train, 491 F.2d 63, 68 (D.C. Cir. 1974);  Edmonds Inst., 460 F.Supp.2d at 70.  Here, the so-called factual material presented – the performance in various areas of certain business units or projects – represents the policy-oriented judgments of the Commissioner as to what matters he believes require the attention and decisions of he and his deputies, as well as Bouton's judgments as to what information will be of most assistance to the Commissioner.  To disclose that information, would be to disclose no less than the Commissioner's deliberative process.

Cf. Mapother, supra (vast majority of report prepared for Attorney General covering wartime activities of Kurt Waldheim, former UN Secretary General and Austrian President, and used by Attorney General in deciding whether to bar Waldheim from entering the United States, including factual material, properly withheld under deliberative process privilege because it reflected the exercise of judgment in extracting pertinent information from a much larger universe in order to assist an official who was to undertake discretionary action); Dudman, supra (Air Force entitled to withhold under deliberative process draft manuscript on history of Air Force in South Vietnam during 1961-1964 that assisted decisionmaker in planning and making decisions); Russell, supra (same with respect to draft Air Force report on use of pesticides during Vietnam War); Mead Data Cental, Inc., supra (summaries of discussions among Air Force staff relating only negotiating positions of Air Force and West Publishing Company protected by deliberative process); Montrose Chem. Corp. of Cal., supra (protecting as deliberative process factual summaries of evidence at public EPA hearings on DDT to aid the EPA Administrator in studying the record and reaching a final decision because it reflected the staff's judgment of what was important to assist the Administrator);  Edmonds Inst., supra (descriptions of ongoing National Park Service biotechnology research, summaries of public comments about proposed benefits-sharing arrangement between NPS and private biotechnology researchers from use of species collected in national parks, and a request for information with partial answer about park research considered – but not included in – a benefits sharing

environmental impact statement protected deliberative process because it reflected the editorial judgments of NPS staff); Hamilton Securities Group, Inc., supra (protecting "facts" from draft audit report because it reflected judgments about what information to collect, how to collect it, and how to present it); Melius v. National Indian Gaming Comm'n, 1999 U.S. Dist. LEXIS 17537 (D.D.C. Nov. 3, 1999) (fact summaries showing investigators' determination of FOIA requester's suitability for a gaming management contract protected deliberative process because it reflected investigators' culling of significant from insignificant facts). [6]

It is particularly important to protect from disclosure here the performance information in the MPRs because this information goes to the heart of the Commissioner's own deliberative process. Courts have long protected as sacrosanct the mental processes of high executive decisionmakers. Montrose Chem. Corp. of Cal., 491 F.2d at 69. In that case, the D.C. Circuit held that disclosure of factual summaries would show the deliberative process of the EPA Administrator: the factors he reviewed and how he weighed them in making his decision. That is precisely the outcome here if disclosure is ordered. The public would be privy to exactly what the Commissioner

---

[6] Because the culling of facts can represent a policy-oriented judgment, the deliberative process privilege may compel the withholding of factual material contained in a particular report whereas that same factual material might not be withheld from a request asking for the factual material itself. Dudman, 815 F.2d at 1569. The Internal Revenue Service does not contest that some of the factual material being withheld here might be produced in other contexts. Indeed, some of the factual material in the report is produced in other contexts removed from the deliberative process at issue here. See, e.g., www.irs.gov/taxstats.

viewed as important to monitor prior to his making any decision.  See also, Judicial

Watch of Florida, Inc., 102 F.Supp.2d at 13-15 (holding that Attorney General's notes

taken at meetings concerning possible appointment of an independent prosecutor

exempt from disclosure under the deliberative process privilege because disclosure

could reveal how she prioritized different facts and considerations as part of her

deliberations prior to reaching her decision).  Thus, even the portions of the MPRs

conveying the performance of the individual business units or projects are also part of

the agency's deliberative process.

The entire MPRs, therefore, are deliberative and protected from disclosure

under FOIA Exemption 5 and the deliberative process privilege.

C.    Protecting the MPRs From Disclosure Is Consistent With the Purposes
      Behind the Deliberative Process Privilege.

Not only do the MPRs and the information contained within them satisfy the

criteria of being both predecisional and deliberative, the purposes behind the

deliberative process privilege also justify withholding the MPRs in their entirety.  There

are three primary policy reasons for the deliberative process privilege:

- It improves the quality of agency decisions by encouraging "'creative

    debate and candid consideration of alternatives.'"

- It prevents public confusion resulting from premature disclosure of

    agency discussions that may not affect the agency's final policies.

- "It protects the integrity of the decision-making process itself by
confirming that 'officials should be judged by what they decided(;) not for
matters they considered before making up their minds.'"

Russell, 682 F.2d at 1048 (quoting Jordan, 591 F.2d at 772-73); see also, Coastal States

Gas Corp., 617 F.2d at 868.  As explained in Commissioner Everson's declaration,

protecting the MPRs and the information contained in those reports satisfies all three

objectives.

Protecting the MPRs from disclosure is essential to ensuring candid discussion

among the Commissioner's subordinates, which, in turn, is necessary to ensure that the

Commissioner makes the best decisions possible.  Based upon his experience as head of

the organization, the Commissioner has expressly predicted that "[r]eleasing the MPR

to the public would eliminate the candor and frank discussion I have strived to foster

within the IRS."  The Commissioner anticipates that this lack of candor, with its

concomitant fallout on the decisionmaking process, would exhibit itself in three ways:

(1) business unit executives and project team leaders would argue for less aggressive

internal goals, preventing the Commissioner from recognizing the true potential of the

business unit or project; (2) those same executives and leaders would feel pressure to

portray their organizations as being on target and able to accomplish their internal

goals, thereby skewing the Commissioner's decisionmaking process for allocation of

resources; and (3) managers would be less candid in their commentary about the state

of their operations and reluctant to alert Service executives to potentially controversial

situations, preventing the Commissioner from having as accurate a picture as possible

of the agency's operations and performance before making decisions.  The Supreme

Court acknowledges that this is a logical outcome of disclosure based upon human

nature:  "'[h]uman experience teaches that those who expect public dissemination of

their remarks may well temper candor with a concern for appearances ... to the

detriment of the decision making process.'"  Sears, Roebuck & Co., 421 U.S. at 150-51

(quoting United States v. Nixon, 418 U.S. 683, 705 (1974)); accord, Coastal States Gas

Corp., 617 F.2d at 866; Judicial Watch of Florida, Inc., 102 F.Supp.2d at 15.  Moreover, as

stated above, the courts in this circuit have deferred to the agency's evaluation of

whether disclosure is likely to impede candid discussion.  See Quarles, 893 F.2d at 393;

Chemical Mfrs. Ass'n, 600 F. Supp. at 118. [7]  Thus, this Court should defer to the

Commissioner's analysis that disclosure of the MPRs would likely discourage the

candid discussions necessary to his decisionmaking process.

      This is all the more true here because the MPRs contain interim snapshots of

the business units' and projects' performance and analyses.  In Wolfe, supra, a FOIA

requester sought records indicating what actions had been completed by the Food and

Drug Administration but which still awaited final decision or approval by the Secretary

_____

      [7] The courts recognize the necessity of protecting the candor necessary to the
decisionmaking process even if the information protected would be of interest to the
public:  "In an ideal world not only officials but also the public would receive such
analyses.  But the deliberative process exemption rests on the premise that if both
(nominally) can get them, neither will:  too many analyses will be still-born or wishy-
washy."  Quarles, 893 F.2d at 393.

of Health and Human Services or by the Office of Management and Budget.  The D.C.
Circuit voiced serious reservations about disclosures that would "force officials to
punch a public time clock," i.e., disclosures permitting knowledgeable requesters to
publicize who was delaying the regulatory process.  Id. at 778.  Similarly, here,
disclosure of the MPRs would advertise which business unit or project is behind in
meeting its internal goals even if that business unit or project might ultimately be able
to meet its goals either with or without additional assistance provided by the
Commissioner.  The interim nature of the MPRs therefore makes it even more likely that
disclosure would lead to the lack of candor anticipated by the Commissioner, to the
detriment of the decisionmaking process of the agency as a whole.

Such premature disclosure is also highly likely to lead to public confusion.  The
MPRs include a summary of a business unit's or project's performance to date,
projections, and analyses concerning its ability to meet its goals or stay on plan.
Premature release of this information is likely to confuse the public, since it would only
give the public an intermediate, incomplete picture of a business unit's or project's
performance and what the Commissioner has before him.  In Judicial Watch of Florida,
Inc., 102 F.Supp.2d at 14 n.6, this Court held that divulging the Attorney General's
notes, including her preliminary thought processes and incomplete thoughts, would
confuse the public by divulging reasons for her course of action that might not have
been her ultimate reasons for acting.  Similarly, here, the intermediate performance

2260706.6

reports and analyses may or may not result in actions by the Commissioner and is likely to result in public confusion.

Finally, there is a real danger here that disclosure of the MPRs will harm the integrity of the Commissioner's deliberative process.  "Exemption 5 shields 'the decisional processes of the President [and] other executive officers with policy-making functions.'"  Judicial Watch, Inc. v. Department of Energy, 412 F.3d at 129 (quoting Soucie v. David, 448 F.2d 1067, 1078 (D.C. Cir. 1971)); see also, Montrose Chem. Corp., 491 F.2d at 70 (one important purpose of the deliberative process privilege is ensuring that mental processes of decisionmaker shielded from public scrutiny); Russell, 682 F.2d at 1049 (disclosure of draft Air Force report would "violate the integrity" of the Air Force's decisionmaking process).  In the present case, the Commissioner points out that disclosure of the MPRs would compromise his decisionmaking process, subjecting him to second-guessing about which issues he deemed significant for inclusion in the report and why he has chosen to highlight some projects over others.  Indeed, it would also subject him to "first-guessing" about what he should or should not be doing in response to business units or projects not meeting their internal goals.  Also, as the Commissioner observes, disclosure of the MPRs would completely undermine the Commissioner's ability to determine whether to resolve issues internally or to involve, in some fashion, Treasury executives in the resolution process.  These concerns are entirely consistent with concerns that courts in this circuit have found warranted invocation of the deliberative process privilege.  Cf. Quarles, 893 F.2d at 393 (holding that disclosure of

2260706.6

cost estimates might result in the public not accepting the ultimate rejection of cheaper

options even where that might be warranted); <u>Ashley</u>, 589 F. Supp. at 909 (holding that

disclosure of MSHA self-evaluation might mislead public as to agency policy and might

pressure decisionmakers to prematurely adopt unwise or untested policies).

Accordingly, disclosure of the MPRs would undermine the integrity of the

Commissioner's decisionmaking process.

 Disclosing the MPRs would cause all three harms the deliberative process

privilege is designed to prevent.  Given that all of the information in the MPRs is both

deliberative and predecisional and that its disclosure would cause the very dangers the

deliberative process is designed to avoid, the MPRs are properly withheld in their

entirety under FOIA Exemption 5 and the deliberative process privilege. [8]

---

[8] As argued above, the Commissioner and the Internal Revenue Service strongly believe that the MPRs should be withheld in their entirety under Exemption 5 and the deliberative process privilege.  In the event this Court should disagree, however, the record is clear that a large portion of these reports are analyses, conclusions, and commentary, as well as inextricably intertwined facts, which should be withheld as deliberative process under any circumstances.  Accordingly, if the Court determines that the Service cannot withhold the MPRs in their entirety under the deliberative process privilege, the Service requests that the Court then reconsider the plaintiffs' motion for a <u>Vaughn</u> index or, in the alternative, for *in camera* inspection and permit the Service to establish the specific contours of partial withholding under deliberative process using one of these two methods.

II.     References on Eight Pages to a Taxpayer's Transaction That Would Identify  the
        Taxpayer Are Exempt Under FOIA Exemption 3 in Conjunction With 26 U.S.C.
        § 6103(a).

        5 U.S.C. § 552(b)(3) authorizes the withholding of information specifically

exempted from disclosure by statute under certain conditions.  26 U.S.C. § 6103(a),

which prohibits the disclosure of tax return information, defined in 26 U.S.C.

§ 6103(b)(2), [9] is a qualifying nondisclosure statute.  See Church of Scientology of Cal. v.

IRS, 484 U.S. 9, 11 (1987); Lehrfield v. Richardson, 132 F.3d 1463, 1467 (D.C. Cir. 1998);

Judicial Watch, Inc. v. United States Dep't of Justice, 306 F.Supp.2d 58, 66 (D.D.C. 2004).

The MPRs for January through August 2006 each contain one page that references

confidential tax return information of a taxpayer, specifically a discussion about a

business transaction between the Service and the taxpayer, the taxpayer's seeking of a

private letter ruling, the status of the taxpayer's efforts, and the effect of the private

letter ruling and other changed circumstances on the transaction.  Portions of these

_____

        [9] 26 U.S.C. § 6103(b)(2)(A) defines "return information" as including

                a taxpayer's identity, the nature, source, or amount of his
                income, payments, receipts, deductions, exemptions, credits,
                assets, liabilities, net worth, tax liability, tax withheld,
                deficiencies, overassessments, or tax payments, whether the
                taxpayer's return was, is being, or will be examined or
                subject to other investigation or processing, or any other
                data received by, recorded by, prepared by, furnished to, or
                collected by the Secretary with respect to a return or with
                respect to the determination of the existence, or possible
                existence, of liability (or the amount thereof) of any person
                under this title for any tax, penalty, interest, fine, forfeiture,
                or other imposition, or offense ...

2260706.6

pages are exempt from disclosure under FOIA Exemption 3 in conjunction with 26

U.S.C. § 6103(a), because release of these portions would identify the transaction and,

thus, the taxpayer.  In addition, the names of the federal agencies having an interest in

the transaction are part of the private letter ruling not open to the public and are,

therefore, the taxpayer's confidential return information under 26 U.S.C. §§ 6110,

6103(b)(2)(B). (Statement, ¶ 29.)

CONCLUSION

The undisputed facts establish here that the MPRs are both predecisional and a

critical part of the ongoing deliberative process of the Commissioner and the Internal

Revenue Service.  The Commissioner has explained how disclosure of these reports

would cause all the dire consequences that the deliberative process privilege is

designed to prevent, and his explanation is entitled to deference.  Accordingly, this

Court should find that the MPRs in their entirety are exempt from disclosure pursuant

to Exemption 5 and the deliberative process privilege, [10] grant the Internal Revenue

Service summary judgment, and dismiss this action with prejudice.

Dated:  March 9, 2007.

        Respectfully submitted,


        /s/ David M. Katinsky
        DAVID M. KATINSKY
        Trial Attorney, Tax Division
        U.S. Department of Justice
        P.O. Box 227
        Ben Franklin Station
        Washington, D.C. 20044
        Telephone: (202) 307-6435

OF COUNSEL:

JEFFREY A. TAYLOR
United States Attorney

---

[10] The Court should also find that portions of eight pages are also exempt under Exemption 3 in conjunction with 26 U.S.C. § 6103(a).

2260706.6